RENTFROW *v.* THE STATE.

1. Even though the admission of the testimony objected to may have been erroneous, the error was subsequently cured by the action of the trial judge in ruling the evidence out and instructing the jury to disregard it.

2. An essential element of voluntary manslaughter is passion on the part of the slayer. The fact that the person slain may himself have been actuated by violent passion, in the absence of any demonstration by him against the slayer, has no bearing upon the grade of the homicide. Unless it be shown that the person killing was so overcome by passion as to exclude all idea of deliberation or malice, the killing is not voluntary manslaughter. Tested by this rule, there was no manslaughter in the present case.

Argued June 20,—Decided August 1, 1905.

Indictment for murder. Before Judge Reagan. Fayette superior court. May 13, 1905.

*A. O. Blalock, J. W. Wise,* and *H. M. Dorsey,* for plaintiff in error. *John C. Hart, attorney-general,* and *O. H. B. Bloodworth, solicitor-general,* contra.

CANDLER, J. Stephen Rentfrow was tried for the murder of his daughter-in-law, Mary Rentfrow, and was found guilty with a recommendation that he be sentenced to the penitentiary for life. He made a motion for a new trial, which was overruled, and he excepted.

1. The motion complains that the court erred in admitting evidence to the effect that the character of the accused for violence was bad, over the objection, made at the time the evidence was offered, that only the general character of the accused was in issue, and that evidence as to his character for any particular trait was inadmissible. Regardless of the merit of this objection, it appears that before the argument began the court ruled out the evidence objected to, and instructed the jury to disregard it; and so, conceding that the admission of the evidence in the first place was, erroneous, that error was completely cured, and the accused has no ground for complaint.

2. The two remaining grounds of the amendment to the motion for a new trial both complain, in effect, that the court erred in failing to give in charge to the jury the law of voluntary manslaughter; and this is really the controlling question in the case. The case is, on its facts, a very peculiar one. The accused is an aged man—nearly fourscore years old—and the deceased,

as has already been stated, was his daughter-in-law. It is infer-
able from the testimony of the witnesses that there had long been
bad feeling between the families of the two, and that the entire
story of the causes leading up to the homicide is not disclosed by
the record brought to this court. The only eye-witness to the
tragedy was Ross Rentfrow, the husband of the deceased and the
son of the accused. From his testimony it appeared that the
killing took place between six and seven o'clock in the morning.
Witness and his wife were living on land belonging to the accused.
As witness was preparing to go to work, he observed the accused,
at a distance of nearly two hundred yards from the house where
he and his wife were, apparently about to go through a garden
which the latter had cultivated. Witness thought he was going
to tear up the garden; whereupon he called his wife's attention to
the matter. "She watched him until he got to the garden; then
she taken her gun and said she was going to make him get out
of her garden. He had threatened to tear the garden all to pieces.
. . She just said he had to get out of the garden; that she and
her children had worked it and made it. . . I said if I was her
I would not go. She said she would go or die." The gun was
loaded. The deceased then went to the garden, carrying the
loaded gun, while witness remained at the house, a distance of
175 yards intervening. As to whether witness could hear what
conversation took place between the accused at that distance the
record is not clear. He testified: "She asked him to get out of
the garden, that she had worked and made it; and that is what I
testified. She kept saying something else." The accused then
picked up a basket which he had been carrying and which con-
tained a pistol and some cabbage, " and got it up in his arm. He
started out toward home, and she started to turn and start home.
He threw the things down and commenced shooting. . . She
was running from him at the time he done the shooting, and he
kept advancing on her." Three shots were fired by the accused,
two of which struck the deceased, one in the hand and one in the
back of the head. The deceased and the accused were fifteen or
twenty feet apart when the shooting took place. While the ac-
cused was firing, the gun which the deceased carried with her was
discharged, apparently accidentally. Of the witnesses who heard
the firing but did not see the occurrence, some testified that the

shots were in such rapid succession that they could not tell which was fired first, the pistol or the gun; others were positive that the pistol shots were fired first. No witness testified that the gun was fired before the pistol. The statement of the accused was to the effect that his first knowledge of the presence of the deceased near him was when he heard her call angrily to him to get out of the garden; that he looked up and saw that she had the gun pointed at him; that she repeated her demand that he get out of the garden, called him an "old gray-headed rascal," and threatened to kill him; that immediately thereafter she fired upon him, and that he was compelled to shoot to save his own life.

."Manslaughter is the unlawful killing of a human creature, without malice, either express or implied, and without any mixture of deliberation whatever." Penal Code, § 64. "In all cases of voluntary manslaughter, there must be some actual assault upon the person killing, or an attempt by the person killed to commit a serious personal injury on the person killing, or other equivalent circumstances to justify the excitement of passion, and to exclude all idea of deliberation or malice, either express or implied. . The killing must be the result of that sudden, violent impulse of passion supposed to be irresistible." Penal Code, § 65. It will be seen that the one essential element of voluntary manslaughter is passion — hot blood. When an unlawful killing is shown by the State, the presumption is that it was prompted by malice; and to reduce the homicide below the grade of murder it is necessary for the evidence to show the absence of malice. If the state of mind of the accused in the present case could be inferred from that of the deceased at the time when she seized her gun and announced her determination to make him get out of her garden, a jury might well have found that he was actuated by passion rather than malice. There is in this case, of course, no question of mutual combat. The meeting was sudden and un-expected, and immediately preceded the homicide. And it must be borne in mind that the mental state of the accused — not that of the deceased — is the test to determine whether a homicide be manslaughter. Was there an "actual assault upon the person killing, or an attempt by the person killed to commit a serious personal injury on the person killing?" Only by the statement of the accused can such a theory be upheld; and it is well settled

that, in the absence of a request, the judge is not bound to charge upon any theory whose sole foundation is in the prisoner's statement. Were there "other equivalent circumstances to justify the excitement of passion, and to exclude all idea of deliberation or malice, either express or implied?" If so, no witness testified to them. The woman's husband testified that she made no demonstration whatever against the accused; and that when shot she was retreating. Her state of mind when she left the house, the purpose for which she carried her gun, and her intentions towards the accused cast no light on what took place after she reached the garden; and that is the main thing to be determined in ascertaining whether or not there is manslaughter in the case. The case made by the State was one of brutal assassination. That made by the statement of the accused was one of justifiable homicide in self-defense. There is nothing to show that the accused was actuated by the sudden and ungovernable passion which the law recognizes as necessary to reduce a homicide below the grade of murder; and we will not reverse the judgment of the trial court on account of the failure to charge the law of manslaughter.

The foregoing discussion renders it manifestly unnecessary to discuss the contention that the verdict was contrary to law and the evidence.

*Judgment affirmed. All the Justices concur, except Simmons, C. J., absent.*